## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

RICK COTTON,            )
                             )
       **Plaintiff,**        )
                             )
**v.**                         )      **Case No. 3:09-cv-0215**
                             )
**CITY OF FRANKLIN**        )      **Judge Thomas A. Wiseman, Jr.**
                             )      **Magistrate Judge Knowles**
       **Defendant.**        )

## MEMORANDUM OPINION

Plaintiff Rick Cotton brings claims for race and age discrimination under 42 U.S.C. §§ 1981 and 1983,Title VII of the Civil Rights Act of 1964, the Tennessee Human Rights Act ("THRA"), and the Age Discrimination in Employment Act ("ADEA").  Defendant City of Franklin ("City") has now filed a motion for summary judgment asserting that:  (1) Cotton's claim for hostile work environment is barred by the doctrine of *res judicata*; (2) Cotton's race-discrimination claim based upon his allegedly being subject to disciplinary action in November 2007 is subject to dismissal because he cannot show that the disciplinary action constitutes a materially adverse employment action; (3) Cotton's retaliation claim based upon the same disciplinary action fails because the alleged discipline was not an adverse action of the type that would deter a reasonable employee from making or supporting a charge of discrimination; (4) Cotton's race-discrimination claim based upon a failure to promote fails because Cotton cannot establish that the City's legitimate, nondiscriminatory reasons for its action are pretextual; (5) Cotton has not stated a *prima facie* case of age discrimination under the ADEA; and (6) Cotton cannot bring a claim against a municipality under 42 U.S.C. § 1981.   The City's motion does not expressly address Cotton's claim of retaliation based upon the City's failure to promote him.

With respect to those claims regarding which the City does seek summary judgment, the Court finds, for the reasons explained herein, that the City has established that it is entitled to judgment in its favor as a matter of law as to all claims except the hostile-work-environment claim.  The motion will therefore be granted in part and denied in part.  Because the City did not move for summary judgment as

to the retaliation claim based on the failure to promote, that claim and the hostile-work-environment claim will remain pending.

I.    **FACTUAL BACKGROUND**

The following facts are either undisputed for purposes of summary judgment or are viewed in the light most favorable to the plaintiff as the non-moving party, unless otherwise indicated.

Plaintiff Rick Cotton is an African American man employed by the Franklin Fire Department (the "Fire Department"), a division of the City of Franklin. Cotton was first hired as a firefighter by the Fire Department in 1987, was promoted to engineer in or around 1994, and was promoted to the rank of lieutenant in 2000, the position he continues to hold. In June 2006, Cotton filed suit against the City alleging disparate treatment and a hostile work environment because of his race (the "2006 Lawsuit"). The factual allegations upon which Cotton's claims in the 2006 Lawsuit were premised, spanned a period of almost twenty years. The City reached a settlement agreement with Cotton on August 9, 2007, which resulted in Cotton's receiving a lump-sum payment of $250,000.00 in exchange for dismissal of the 2006 Lawsuit and execution of a general settlement and release agreement, pursuant to which Cotton agreed to release the City "from any and all claims . . . of every nature whatsoever which [he] now has or which may hereinafter accrue to him." (Cotton Dep. Ex. 8.)

In the instant Complaint, filed in March 2009, the plaintiff raises claims of both race and age discrimination, race-related hostile work environment, and retaliation based upon his having previously filed a lawsuit for race discrimination. His claims are based primarily upon the City's failure to promote him to the rank of captain in December 2007 and his allegedly being disciplined in November 2007, as well as upon other alleged incidents he claims contribute to a hostile work environment. Cotton filed a charge with the EEOC regarding these issues on August 11, 2008. In his charge, Cotton complained as follows:

> In retaliation for filing a previous charge of discrimination . . . , I was passed over for promotion to Captain in December 2007. Less qualified younger White males were promoted. On or about November 2007, I received unwarranted discipline from Captain Tom Chaffin (White) and have been verbally abused and spoken to harshly by Assistant Chief, Gentry Fox (White). Chief Mike Culberson (White), Chief Rocky Garzarek (White), have scrutinized my performance and subjected me to unfair treatment.
>
> I believe that I have been retaliated against for filing a previous charge of discrimination, in violation of the Age Discrimination in Employment Act of 1967, as amended and Title VII of the Civil Rights Act of 1964, as amended.

(Doc. No. 19-1, at 42.)

**A.      Facts Related to the City's Failure to Promote Cotton to Captain**

Cotton applied for the position of captain in the fall of 2007 when the Fire Department announced three open positions at that rank.  For each promotion within the Franklin Fire Department, a certification list is created for the specific position.  The certification list includes all the applicants who applied for the position and their scores in various categories including seniority, education, training, responses to questions during a "Chiefs' Interview," tactical skills, oral presentation, and skill in dealing with a "problem employee."   The latter three categories are assessed by a third-party "Assessment Center," whose members come from outside the community.[1]  The raw scores in each category are weighted:  The Chiefs' Interview is worth thirty percent of the total; seniority, ten percent; training and education are worth five percent each; and the scores from the Assessment Center together are worth fifty percent of the entire score.  The candidates are then ranked based on their scores.  Once the certification list is complete, the Human Resources Director for the City reviews the list to certify that the scores are accurate.  Each applicant receives a copy of the certification list showing his name and rank on the list.  The scores for the other candidates are visible, but their names are not.

The Fire Chief receives the list and makes the decision of whom to promote based on the list.  If one position is open, he can select anyone of the top three candidates on the list for promotion without regard to their order on the list; if two positions are open he can select from the top five candidates; if three positions are open, he can select from the top seven candidates.  Within those parameters, the Fire Chief has total discretion as to whom to promote.

When Cotton applied for the position of captain in 2007, a total of eight people applied.  After going through the promotional process, he was ranked fifth of the eight on the certification list.  When he received his copy of the certification list, he realized a mistake had been made on his score for training:

_____

[1] Although the City asserts that "experience" is taken into consideration in the assessment and promotional process, the record indicates that seniority, rather than experience *per se*, is a factor in the process.  (*See, e.g.*, Harmon Dep. 15:13–23 ("They [the candidates] [a]re given up to ten points for seniority. . . .  And it's a point a year up to ten points, and our manual says that they will not be given more than ten points.")  Captain Garzarek testified that, while the certification list rank was of primary importance, experience also "comes into play" when he decided whom to promote.  (Garzarek Dep. 48:4–14.)

He was given only four points and believed he should have been given five. He brought this error to the Human Resource Director's attention, and it was belatedly corrected. The added point did not change Cotton's rank on the certification list, however—he was still fifth.

Cotton alleges that he should have received a higher score on the "Chiefs' Interview" portion of the assessment. For the "Chiefs' interview" category, each candidate for promotion interviewed with a panel made up of Fire Chief Rocky Garzarek, Deputy Chief Mike Culberson, and Assistant Chiefs Gentry Fox, Greg Baltimore, and Eddie House.[2] Each chief scored the candidates, and each candidate's scores from each chief were averaged. The maximum possible weighted score was 30; Cotton's weighted score was 23.25. The highest score given for the Chiefs' interview was 25.50; the lowest, 21.75.

Cotton contends that he scored lower than he should have on the Chiefs' Interview, and that this low ranking was the result of bias on the part of some members of the panel that conducted his interview. Cotton's contention of bias is based in part on his assertion that he reviewed the other candidates' answers to the interviewers' questions and that his answers, in his opinion, were the same if not better than the answers given by the three white employees who were promoted. Cotton also testified that Assistant Chief Greg Baltimore, who was one of the interviewers on the panel, later told him that Assistant Chief Fox stated during the deliberation process that Greg Wild, one of the candidates who was selected for promotion, was not "ready for the job" of captain. (Cotton Dep. 22:9–15.)

Cotton's contention that some of the panel members—specifically Garzarek, Culberson, and Fox—were biased is based on his prior interactions with those panel members. (Cotton Dep. 17:1–18.) Most of the conduct regarding which Cotton complains occurred well before he was denied his promotion. For instance, according to Cotton, Chief Garzarek allegedly commented to another firefighter at some point during the pendency of Cotton's 2006 Lawsuit about Cotton and other African American firefighters who had filed EEOC complaints against the Fire Department, "Yes, those niggers want to get promoted but they just don't qualify." (Eichner Dep. 9-12.)

The "assessment center" portion of the ranking process tested all the candidates in the areas of tactical skills, an oral presentation, and their method of dealing with a hypothetical "problem employee." (Garzarek Dep. 24, 27–28.) The evaluators were fire professionals brought in from cities such as

---

[2] Assistant Chief Greg Baltimore is black; all the other Chiefs are white.

Jackson, Tennessee and Hoover, Alabama; an outside consulting company trained the evaluators and implemented the testing. Cotton does not raise any complaints about the score he received from the assessment center, which he believes to be fair. Cotton scored very well on the oral presentation; he received the lowest score of all the candidates—by a wide margin—in the tactical skills category,[3] and scored sixth out of the eight in dealing with the hypothetical problem employee. Again, however, Cotton does not dispute the impartiality of the assessors who scored those categories, and agrees that the scores he received in these areas were fair. As for the remaining categories, he received a ten out of ten in the area of seniority (as did six of the other seven candidates); zero for education (as did six of the other seven candidates); and five out of five for training (after adjustment).

Three captain positions were open in the City at the time Cotton applied. The persons who ranked first, second and fourth on the list, all white men, received the promotions, including Greg Wild. Chief Garzarek skipped over the person who ranked third. Garzarek was not required to go straight down the list in sequential order when making his selection. Typically, however, Garzarek promotes candidates based solely on their rank on the certification list; he has skipped over a higher-ranked candidate to promote a lower-ranked candidate very few times. Garzarek testified that in this instance, he skipped over the person who was third on the list because of a rumor that that person had met with another firefighter's wife in an attempt to have an affair with her, although no inappropriate behavior was ever substantiated. Garzarek believed the incident reflected badly on the third-ranked candidate's character and integrity, and for that reason chose not to promote him.

Because Cotton was fifth on the list, Garzarek could have promoted him, but to do so he would have been required to skip over the fourth candidate, who was equally qualified and ranked higher on the certification list. Garzarek testified that, while other factors such as experience and performance evaluations may be considered, the scores on the certification list are the key component to his decision of whom to promote. Cotton argues, in fact, that he should have been promoted based on experience, because he had served as lieutenant for seven years prior to this application for promotion to captain, while the white employees who were promoted had served as lieutenants just one year or less prior to

---

[3] Although Cotton does not dispute the fairness of the scores from the Assessment Center, he claims that he scored lower in the tactical skills category than he otherwise would have because Deputy Chief Mike Culberson was in the room at the time and intimidated him just by his presence.

their promotion.  In addition, Cotton had been performing the job responsibilities of a captain while holding the rank of lieutenant.

### B.    Disciplinary Incident in November 2007

Cotton asserts that he was wrongfully disciplined by Captain Tom Chaffin,[4] purportedly for leaving his station shorthanded at the end of a shift but, Cotton claims, actually in retaliation for having filed a prior discrimination complaint.

Each shift at the Fire Department ends and begins at 6:00 a.m.  The Department had been having issues with firefighters leaving at the end of their shifts but before their replacements had arrived, which caused some stations to run low on staff.  As a result of that problem, the Fire Department had instituted a new directive that a firefighter could not leave his station until he was officially relieved by another firefighter who would fill his position.  This rule, however, was not yet in writing at the time the incident in question occurred.

One morning in November 2007, Cotton's shift was ending, but no one had arrived to relieve him. On this particular day, Captain Tom Chaffin was acting as the Assistant Chief over the incoming staff, in place of Assistant Chief Gentry Fox.  By 6:05 a.m., the station had only two or three firefighters on duty for the oncoming shift, which meant it was understaffed.  Cotton called Captain Chaffin to make sure he was aware the station was short-handed.  Chaffin directed Cotton and another firefighter to stay until he could get someone else to the station.[5]  Cotton informed Chaffin he could stay for a while but would need to leave by 6:30 to pick his daughter up for school.

At 6:20 a.m., one other person showed up to work the new shift, so Cotton sent home the other firefighter waiting to be relieved, because he did not want that firefighter to be late for his second job. About ten minutes later, Cotton called Chaffin to let him know he had to leave.  Chaffin became irate and

---

[4] Cotton asserts that Chaffin took action with Chief Garzarek's "encouragement," but does not cite to any evidence in the record to support that assertion other than his own opinion as expressed in his interrogatory answers.  Chaffin testified that Garzarek neither encouraged nor discouraged him (Chaffin Dep. 26:23), and Garzarek testified that he had only a vague and general recollection of the incident as a whole and did not remember specifically whether he discussed it with Chaffin at all.  (Garzarek Dep. 59:19–61:19.)

[5] Cotton testified that Assistant Chief Gentry, on similar occasions, had always told him to go ahead and leave, even if his replacement had not yet arrived.  (Cotton Dep. 60:7–18.)  Gentry was not on duty the particular morning in question, however.  (Cotton Dep. 62:10–12.)

told Cotton he was doing what he could to find someone else to send over there. Cotton explained to Chaffin that Fox usually allowed the station to run with three people. Chaffin reminded Cotton about the Chief's new directive. Cotton told Chaffin he understood, but he had to take his daughter to school; he told Chaffin: "It's not my problem any longer. I've stayed as long as I can stay." (Cotton Dep. 64:4-5.) Chaffin told Cotton to do what he had to do. (Cotton Dep. 64:6-7.)

Chaffin finished his morning rounds and then went to headquarters. He testified in his deposition that he became aware of a disciplinary action being instituted against another firefighter for exactly the same conduct. Chaffin stated that in light of the new rule and the other disciplinary action, he felt he needed to institute disciplinary action against Cotton. (Chaffin Dep. 20:7–11.)

While at headquarters, Chaffin asked Garzarek about the process of writing up an employee, because he had never instituted disciplinary action before. He filled out a counseling letter the same day. He placed it in a sealed envelope and forwarded it to Deputy Chief Mike Culberson, the next supervisor in Chaffin's chain of command. Chaffin also made Fox aware of the counseling letter.

A meeting was conducted among Deputy Chief Mike Culberson, Chief Baltimore, Cotton, and both the Director and Assistant Director of Personnel to discuss the incident. Harmon, HR Director, instructed Chief Baltimore to meet with Chief Fox, Chaffin and Cotton and to resolve the issue without disciplinary Action. (Culberson Dep. 15:5–13.) At some point thereafter, Fox brought it to Chaffin's attention that he had discussed the issue with Chief Baltimore and recommended that the issue be dropped, because the disciplinary action against the other firefighter who had been written up for the same violation had ultimately been dropped because the directive was new and had not been officially implemented. Based on that information, Chaffin agreed that the counseling letter should be dropped. (Chaffin Dep. 36:20–37:10.) In the end, Chief Baltimore, as Cotton's direct supervisor, met with Cotton, at Garzarek's direction, to discuss the matter with him. Garzarek told Baltimore that Cotton was not in trouble and that nothing was going to happen to him. Baltimore did talk to Cotton; Cotton requested a copy of the counseling letter, and Baltimore gave it to him. Baltimore took the original back to headquarters, and Garzarek destroyed it. Neither Cotton nor any of his supervisors signed the form. Pursuant to Fire Department policy, when discipline is rendered, the disciplined employee and his supervisor are required to sign the form. The form was never formally issued, it never went into Cotton's

personnel file, and Cotton did not receive any punishment as a result of leaving before his replacement arrived.

### C. Other Allegedly Harassing, Retaliatory or Discriminatory Behavior

Cotton complains of numerous harassing and discriminatory actions that took place prior to the resolution of the 2006 Lawsuit and the execution of the Release in August 2007. He also complains of several incidents that occurred after execution of the Release. The Court notes that many of the incidents are supported by hearsay only; with respect to many of them, the record is unclear as to the date upon which they occurred. In any event, a complete recital of Cotton's allegations is not necessary here, based on the Court's conclusion below that the claim based upon allegedly harassing events that occurred after execution of the Release are not barred by the doctrine of *res judicata.*

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

At the summary judgment stage, the moving party bears the initial burden of identifying those parts of the record that demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, however, the moving party may meet its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. When the moving party has carried this burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The non-moving party also may not rest upon its mere allegations or denials of the adverse party's pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial. *Id.*; Fed. R. Civ. P. 56(e)(2).

After the parties have presented their evidence, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In evaluating the evidence, the court must draw all inferences in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient [to defeat a motion for summary judgment]; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

## III.    ANALYSIS

### A.    Hostile-Work-Environment Claim

Plaintiff's first complaint, Case No. 3:06-cv-580 in the United States District Court for the Middle District of Tennessee, was filed June 6, 2006 and was dismissed with prejudice in September 2007 after Cotton's execution of a "Full, Final and Absolute Release and Settlement Agreement" ("Release") on August 9, 2007. Pursuant to the Release, Cotton agreed as of that date to

> release, acquit and forever discharge the City . . . from any and all claims, causes of action, demands, rights, damages, back pay, front pay, disbursements, and all other claims of every nature whatsoever which [Cotton] now has or which may hereinafter accrue to him on account of, or in any way, growing out of any and all known and unknown, foreseen and unforeseen, physical and or mental injuries and/or any damage of any kind whatsoever, and the consequences thereof and/or expenses incurred or sustained . . . as a result of or in any way related to or arising out of [Cotton's] employment by the City of Franklin.

(Doc. No. 19-1, at 48, Cotton Dep. Ex. 8.)

Under Tennessee law, "[a] release is a contract; therefore, the rules of construction applicable to contracts apply in construing the terms of a release. *Richland Country Club v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn. Ct. App. 1991). The following principles apply when interpreting a release:

> Generally speaking, the scope and extent of [a] release depends on the intent of the parties as expressed in the instrument. A general release covers all claims between the parties which are in existence and within their contemplation; a release confined to particular matters or causes operates to release only such claims as fairly come within the terms of the release.

*Cross v. Earls*, 517 S.W.2d 751, 752 (Tenn. 1974). Further:

> In interpreting a release to determine whether a particular claim has been discharged, the primary rule of construction is that the intention of the parties shall govern and this intention is to be determined with a consideration of what was within the contemplation of the parties when the release was executed, which in turn is to be resolved in light of all of the surrounding facts and circumstances under which the parties acted.

*Evans v. Tillett Bros. Const. Co.*, 545 S.W.2d 8, 11 (Tenn. Ct. App. 1976) (quoting 66 Am. Jur. 2d Release § 30); *see also Jackson v. Miller*, 776 S.W.2d 115, 118 (Tenn. Ct. App. 1989) ("The cardinal rule for interpretation of contracts is to ascertain the intention of the parties and give effect to the intention consistent with legal principles.").

In light of these principles, it is clear that the Release in this case was intended to be a general release of all "any and all" employment-related claims against the City, known or unknown, based on any act by the City up through and including the date of the Release. As a result of the Release, Cotton is barred from bringing any employment-related claim against the City, including a hostile-work-environment claim, based on any act perpetrated by the City prior to Cotton's execution of the Release, regardless of whether the claim actually was or could have been asserted in the 2006 Lawsuit. *See Sherman v. Am. Water Heater Co.*, 50 S.W.3d 455, 459 (Tenn. Ct. App. 2001) ("A general release such as the one under consideration, not restricted by its terms to particular claims or demands, covers all claims between the parties which are in existence and within their contemplation at the time it is executed.") Consequently, to the extent Cotton's hostile-work-environment claim is premised upon events that predate execution of the Release, the claim is subject to dismissal.[6]

The City, however, is not merely seeking summary judgment of the claim to the extent it is based on pre-Release conduct. Rather, the City appears to be arguing that the hostile-work-environment claim is subject to dismissal in its entirety on *res judicata* grounds, on the basis that the claim is "essentially and substantially the same on-going claim that was settled in his lawsuit in 2007," with the addition of " a few new incidents, most of which are [based on] hearsay." (Def.'s' Mem. Supp. S.J., Doc. No. 18, at 15.) According to the City, "adding a few new factual allegations to the second complaint, or complaining about a longer period of time, does not destroy the identity between the alleged different causes of action." (Doc. No. 18, at 14 (citing *Yaba v. Roosevelt*, 961 F. Supp. 611 (S.D. N.Y. 1997); *Vela v. Sauk Vill.*, No. 00 C 6421, 2002 U.S. Dist. LEXIS 15306, 2002 WL 1916835 (N.D. Ill. Aug. 20, 2002); *Lee v. Kroger Co.*, 901 F. Supp. 1218 (S.D. Tex. 1995)).)

---

[6] Cotton's Complaint references in some detail actions taken by the City and Fire Department that occurred prior to the execution of the Release; it appears, however, that he provided much of that material as background and that he did not actually intend to state a hostile-work-environment claim based on events that predate the Release.

The cases to which the defendant cites stand for the unremarkable proposition that "*res judicata* applies not only to those claims actually brought in the first action, but also to those that could have been brought in the first action." *Yaba*, 961 F. Supp. at 623; *Lee*, 901 F. Supp. at 1221–22 ("*Res judicata* bars all claims that were or could have been advanced in support of the cause of action on the occasion of its former adjudication.") (citations and internal quotation marks omitted); *Vela*, 2002 WL 1916835, at * 2 ("The doctrine of *res judicata* dictates that a final judgment on the merits in a court of competent jurisdiction bars the same parties or their privies from relitigating not only issues which were in fact raised and decided but also all other issues which could have been raised in the prior action."). In *Yaba*, the plaintiff alleged two additional incidents of alleged harassment that were not mentioned in her first complaint, but both incidents occurred prior to the filing of the first complaint and therefore *could* have been raised in the prior action. Thus, contrary to the defendant's suggestion, neither *Yaba* nor the other cases cited support the argument that *res judicata* bars claims based on facts that occurred after the *filing* of the first action, much less claims based on acts that occurred after *dismissal* of the prior action.

The City's argument that the entire hostile-work-environment claim is subject to summary judgment appears to be based on the *Yaba* court's passing observation "[t]hat the [two] additional incidents alleged in Complaint Two would, by themselves, be insufficient to state a claim [for harassment]," which the court construed as further substantiating its conclusion that the claim "in Complaint Two is part of the same transaction as the claim Yaba [adjudicated in the prior action]." *Yaba*, 961 F. Supp. at 622. At least two factors distinguish this case from *Yaba*, however: (1) the incidents in question here all occurred *after* Cotton's execution of the Release and dismissal of the 2006 Lawsuit; and (2) Cotton's claim is premised on more than two discrete events.

In any event, aside from its "second-bite-at-the-apple" argument and a passing reference to the relatively "few new incidents" raised in the current action, the City does posit any other substantive grounds for dismissal of the hostile-work-environment claim—for example, by arguing that the racial harassment allegedly suffered by Cotton post-Release was not "so severe or pervasive as to alter the conditions of [his] employment." *Faragher v. Boca Raton*, 524 U.S. 775, 786-87 (1998). Consequently, while the Court agrees that Cotton cannot base any of his new claims on events that occurred prior to the execution of the Release in August 2007, the City's motion for summary judgment will be denied insofar

as it pertains to events that post-date execution of the Release, which are not barred either by the Release itself or by the doctrine of *res judicata*.

### B.    Discrimination Claims

As an initial matter, the Court notes that, although Cotton asserted a claim for age-based discrimination in his Complaint, he has not responded to the defendant's motion for summary judgment as to that claim, and he did not refer to any evidence of age discrimination in his answer to the City's interrogatory requesting such information.  (Doc. No. 19-1, at 38–40).  It therefore appears that Cotton has abandoned the claim.  Even if he has not intentionally abandoned the claim, Cotton has failed to present a *prima facie* case of age-based discrimination.  The City is entitled to summary judgment as to that claim.

The City also seeks summary judgment of Cotton's race-discrimination claim based on his unsuccessful bid to be promoted to captain in late 2007, and upon the alleged disciplinary action taken against Cotton around the same time.   These claims are considered below.

#### 1.    *Race Discrimination Claim Based on Failure to Promote Plaintiff in December 2007*

To prove race discrimination in violation of Title VII, a plaintiff may rely upon either direct or indirect evidence.  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc) (citation omitted).  "Evidence of discrimination is not considered direct evidence unless a racial motivation is explicitly expressed."  *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006).   Indirect or circumstantial evidence, on the other hand, "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred."  *Wexler*, 317 F.3d at 570.  "The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both."  *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348–49 (6th Cir. 1997).

In the case at bar, Cotton does not present direct evidence of discrimination in the hiring process; he seeks to prove his claim through the use of indirect evidence.  Consequently, in order to withstand summary judgment, he must support his claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).   To establish a *prima facie* claim of racial discrimination with indirect evidence based on a failure to promote under Title VII, a plaintiff generally

must demonstrate that:  (1) he is a member of a protected class; (2) he applied for and was qualified for a promotion; (3) he was considered for and was denied the promotion; and (4) an individual of similar qualifications who was not a member of the protected class received the job at the time the plaintiff's request for the promotion was denied.  *White v. Columbus Metro. Housing Auth.,* 429 F.3d 232, 240 (6th Cir. 2005).

Once the plaintiff makes such a showing, the burden shifts to the defendant to rebut the presumption of discrimination by proffering a legitimate non-discriminatory reason for the defendant-employer's action.  The defendant's burden, at all times, is merely one of "production," because the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Manzer v. Diamond Shamrock Chems. Co.,* 29 F.3d 1078, 1083 (6th Cir. 1994) (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993)), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.,* --- U.S. ---, 129 S. Ct. 2343, 2351–52 (2009).  If the employer satisfies its burden of production, the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason was not its true reason but was, in fact, a pretext for illegal discrimination or retaliation.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981).

In the present case, the City concedes that Cotton has established a *prima facie* case of race discrimination:  He is a member of a protected class who applied for a promotion for which he was admittedly qualified, and a white man (or three white men) with similar qualifications received the promotion instead.  For its part, the City also meets its burden of articulating a legitimate, non-discriminatory reason for its failure to promote Cotton:  that the decision not to promote Cotton was legitimately based upon the fact that those promoted ranked higher than he on the certification list and that the plaintiff's ranking was based on a legitimate promotional process.  *Cf. Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 616 (6th Cir. 2003) (accepting a higher interview score as a legitimate, nondiscriminatory reason for a plaintiff's non-selection).  The City's motion for summary judgment of this claim is premised upon its assertion that Cotton cannot establish that the City's proffered reason for the decision is pretextual.

Pretext may be shown either directly by persuading the trier of fact that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is

unworthy of belief.  *Smith v. Chrysler Corp.*, 155 F. 3d 799, 805-06 (6th Cir. 1998).  "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action."  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008) (citations omitted). "However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'"  *Id.* (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003) (en banc)).  Notwithstanding, a trier of fact may "not reject an employer's [nondiscriminatory] explanation . . . unless there is a sufficient basis in the evidence for doing so.'"  *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009) (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994), *abrogated in part on other grounds by Gross v. FBL Fin. Servs., Inc.*, --- U.S. ---, 129 S. Ct. 2343, 2351–52 (2009)).

Cotton's evidence of pretext includes (1) the Fire Department's use of subjective criteria in the hiring process, specifically in the "Chiefs' Interview" portion thereof, and Cotton's own opinion that his responses to the interview questions were as good as or better than the other interviewees' responses; (2) past bias or discriminatory statements on the part of some members of the "Chiefs' Interview" panel; and (3) Cotton's greater experience working as a lieutenant and *de facto* captain.

The City concedes that the Chiefs' Interview portion of the process involved the use of subjective judgment, but argues that the use of subjective criteria does not establish pretext.  To be sure, the use of subjective criteria alone will not establish pretext.  *Browning v. Dep't of Army*, 436 F.3d 692, 697 (6th Cir. 2006).   But the Sixth Circuit has also found that subjective criteria provide "ready mechanisms for discrimination."  *Grano v. Dep't of Dev. of City of Columbus*, 699 F.2d 836, 837 (6th Cir. 1983), *quoted in Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 461 (6th Cir. 2004); *see also Santana v. City and County of Denver*, 488 F.3d 860, 866 (10th Cir. 2007) ("[E]vidence of pretext may include the use of subjective criteria." (citations omitted)).   Consequently, the use of subjective criteria must be considered in conjunction with Cotton's other evidence of pretext.

Second, Cotton contends that three of the members of the interview panel, Garzarek, Fox, and Culberson, are racist, based on "what was said about [him] in the prior lawsuit about [his] race" by these

three individuals.    (Cotton Dep. 17:13–14.)    Cotton argues that past discriminatory statements by Garzarek, Fox, and Culberson are sufficient to give rise to an inference of bias in their scoring of him on the Chiefs' Interview.  For instance, the former assistant city recorder testified in a deposition in April 2007 that she had heard Chief Garzarek make statements she considered to be racially derogatory sometime in the fall of 2005.  Specifically, she overheard Garzarek speaking with a colleague about the number of EEOC complaints that firefighters had filed around that time.   Eichner commented that it seemed Garzarek had been "having a lot of problems in [his] department lately," to which Garzarek allegedly responded:  "Yes, those niggers want to get promoted but they just don't qualify." (Eichner Dep. 10:14–23).  Cotton also testified that he personally heard Garzarek refer to him and other African Americans as "niggers" through the course of his prior lawsuit.   (Cotton Dep. 35:17–18.)   Culberson, according to Cotton, has "made comments about the blacks, you know, shouldn't have won in lawsuits because we were too dumb to pass the tests."   (Cotton Dep. 30:8–11.)    Cotton made a vague reference in his deposition about how Culberson had treated him poorly when he was under Culberson's direct supervision:  "There's been plenty of things that Chief Culberson has said, you know, in – in the past.  I've been there 20-something years.  Like I've said, a lot of this stuff goes back in the past that – so, I know, you know, what I've heard over the years and I – I know what I've seen."  (Cotton Dep. 30:12–18.)  With respect to Fox,[7] Cotton presented testimony from a witness given in the context of the 2006 Lawsuit that he had overheard Fox refer to another African American firefighter as a "dumb old nigger."   (J. Jones Dep. 8–9.)

Finally, Cotton contends that he was better qualified for the job than those men who were promoted based on his having worked as a lieutenant for seven years at the time of the decision, where

_____

[7] Cotton also testified that there was an instance in the past when a fire captain, Al Black, was on probation for one violation of a City policy when he was caught violating another City policy, specifically, using a City vehicle and City credit card without authorization.  Cotton alleges that, according to City policy, Black should have been demoted or even terminated for committing the second infraction while on probation for the first.  He was not disciplined at all, however.  Cotton alleges that the reason was because, if Black had been demoted or fired, Cotton would have been the person next in line for his position.  He claims that Gentry Fox was overheard saying to another firefighter that he did not want Cotton on his shift.  Cotton surmises that Gentry chose not to discipline Black in order to prevent Cotton from being promoted and to ensure that Cotton did not begin working on Fox's shift.  This "evidence," if it were admissible, would perhaps be sufficient to give rise to an inference that Fox did not like Cotton very much, but not to give rise to an inference that the feeling is racially motivated.  Similarly, Cotton also alleges he was verbally abused by Fox in August 2007, but, other than making that allegation in his interrogatory answers, he has not explained how or under what circumstances he was verbally abused, nor indicated how the verbal abuse might be related to his race.

the selectees had all only worked for a year in that capacity, and based on the fact that Cotton was already fulfilling the functions of captain on his shift, and reporting directly to an assistant chief rather than to a captain. In addition, he contends that Gentry Fox, the direct supervisor of one of the candidates who was selected for promotion, told Chief Garzarek that that candidate was "not ready" for the job of captain, but he was chosen for promotion by Garzarek anyway, despite the undisputed evidence that Cotton was qualified for the promotion.

The Sixth Circuit recently discussed the significance of this kind of "qualifications evidence" at the summary judgment stage in *Bender v. Hecht's Department Stores*, 455 F.3d 612 (6th Cir. 2006). The court in *Bender* addressed the question of how compelling qualifications evidence would have to be for a plaintiff to survive summary judgment on the sole basis of such evidence:

> Whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination. In the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment. On the other hand, in the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former. In negative terms, evidence that a rejected applicant was as qualified or marginally more qualified than the successful candidate is insufficient, in and of itself, to raise a genuine issue of fact that the employer's proffered legitimate, non-discriminatory rationale was pretextual.

*Bender*, 455 F.3d at 626-27 (internal citation omitted).

In the present case, the evidence of Cotton's superior experience constitutes, at best, evidence that he was "as qualified or marginally more qualified than the successful candidate[s]." *Id.* at 627. As such, it does not, in and of itself, establish that his qualifications are so significantly better than the other candidates' that no reasonable employer would have chosen the other candidates over him. Thus, the question of whether the evidence is probative of pretext depends upon the existence of other evidence in the record.

Cotton offers very little in the way of other evidence of discriminatory animus. First, as discussed above, is his claim that he has seen the other candidates' answers to the questions posed during the Chiefs' Interview, and that his answers to the same questions were as good as or better than those of the other candidates. He has not introduced into evidence the other candidates' answers, and his entirely

subjective—and unsubstantiated—opinion as to his own performance on the interview does not qualify as "evidence" that may be considered by the Court.

The "evidence" that three of the five chiefs on the Chiefs' Interview panel were racially biased is also of questionable probative value. First, the Court notes that it is unclear whether evidence of incidents that occurred prior to the execution of the Release Agreement and settlement of the 2006 Lawsuit may be considered as evidence of discrimination in the present lawsuit. Regardless, even assuming it can, that evidence, taken together with the other purported evidence of bias or discrimination, is not sufficient to permit a reasonable jury to conclude that the City's proffered nondiscriminatory reasons for its actions are pretextual.

With respect to the former issue, the Court is not aware of any specific evidentiary rule that would exclude the evidence if it is otherwise admissible and relevant. Rule 408 of the Federal Rules of Evidence pertains only to the admissibility of compromise and offers to compromise generally, but even then the rule "does not require exclusion if the evidence is offered for purposes" of proving liability for or invalidity of a claim. Fed. R. Evid. 408(b). The rule specifically contemplates that evidence of settlement, if otherwise admissible under the rules, is not inadmissible to prove bias or prejudice. *Id.* The evidence offered in this instance does not specifically concern the settlement agreement and is not subject to Rule 408. It is, however, evidence that would presumably have been admissible as either direct or indirect evidence of discrimination in the 2006 Lawsuit, which was settled in its entirety pursuant to the Release agreement executed in August 2007 and subsequently dismissed with prejudice. This Court is reluctant, under the circumstances, to disturb in any way the finality of the judgment entered dismissing that case, or to consider evidence that could have been considered probative of discrimination in the course of the prior suit. In short, Cotton is essentially arguing that evidence of discriminatory behavior in the past is sufficient to give rise to an inference of discriminatory animus in the present.

Assuming the evidence is relevant and admissible, it is thin at best, even when considered in conjunction with the other available evidence. Cotton focuses on the subjective nature of the Chiefs' Interview and his opinion that he did not receive as high a score as he thought he should have on that portion of the promotional process. Notwithstanding, fully fifty percent of each candidate's score was based on the candidates' performance on the "Assessment Center" portion of the testing, which itself

included three areas that were scored by persons from outside the Franklin community; Cotton concedes that the Assessment Center portion of the process was unbiased, and that his scores from the Assessment Center were fair. Cotton's overall ranking in the three areas judged solely by the Assessment Center was fifth out of eight. He scored sixth out of eight on the Chiefs' Interview, and fifth out of eight after all the scores were tabulated. The fact that his ranking on the admittedly unbiased portion of the test was the same as his overall ranking and only marginally better than his ranking on the Chiefs' Interview portion of the assessment strongly suggests that bias did not affect the latter score either. Moreover, as previously noted, Cotton's own subjective opinion that his answers on the interview questions were as good as or better than the other candidates' answers does not constitute admissible evidence that they were in fact better. Further, Cotton only contends that three of the five panel members were biased. The panel also included Greg Baltimore, who was Cotton's direct supervisor and also African American. Cotton has not offered evidence that the scores on the Chiefs' Interview from the three allegedly biased members of the panel were markedly lower than those given to him by the other two panel members, nor has he offered testimony from Baltimore or Eddie House, the fifth member of the panel, that they believed that Cotton performed better than his averaged score from all five members reflected. In other words, even if the Court accepts for purposes of argument that three of the five panel members may have been prone toward bias, nothing but Cotton's speculation supports his contention that his score on the Chiefs' Interview portion of the promotional assessment was lower than it otherwise would have been but for bias on the part of some of the panel members.

In addition, although Chief Garzarek had the discretion to choose among the seven top candidates for the three open positions, he testified that he usually goes straight down the list, and only skips over someone if he has a concrete reason to do so. In this case, he skipped over one of the candidates based on questions about that candidate's judgment and integrity. The City asserts that there was no reason for Garzarek to skip over the fourth candidate on the list, an equally qualified candidate who had scored higher on the testing than Cotton, in order to promote Cotton, in fifth position. Cotton argues that in the past, Garzarek had skipped over a candidate based on the candidate's supervisor's recommendation, and that he could have done so again in this instance, presumably skipping over Greg Wild, the number 1 candidate on the list. Cotton has not offered admissible evidence showing that the

situations are truly comparable, however, and the fact remains that Greg Wild scored significantly higher than Cotton on the tests that made up the ranking on the certification list.

With respect to Cotton's contention that his superior experience should have counted for more, and thus, the Court infers, provided a legitimate basis for Garzarek to skip over the fourth-ranked candidate in favor of Cotton, the plaintiff may well have a valid policy argument, but the fact remains that the categories taken into account in the promotional process were not formed just for this one round of promotions, and the Fire Department had apparently already decided that on-the-job experience was of lesser importance in the promotional process than other factors. And, even if this Court might have concluded that Cotton was better qualified than some of the other candidates who were selected for promotion, the Court is not in a position to second-guess the Fire Department's and Chief Garzarek's discretion in making that decision. Finally, as indicated above, Cotton's qualifications are not so significantly better than the other candidates' that only an unreasonable employer would have chosen the other candidates over him. *Bender*, 455 F.3d at 626-27.

In sum, Cotton has not shown that the Fire Department's explanation for its hiring decisions has no basis in fact or was not the actual reason, or is insufficient to explain the decision. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). Nor is Cotton's evidence sufficient to "challenge[] the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'" *Id.* (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 578 (6th Cir. 2003) (en banc)). This Court must conclude based on the evidence in the record that no rational jury could find that racial discrimination motivated the decision not to promote Cotton. The motion for summary judgment of Cotton's claim based on the failure to promote will therefore be granted. Because "Title VII and the THRA are analyzed under this same legal framework, *Wade V. Knoxville Utils. Bd.*, 259 F.3d 452, 464 (6th Cir. 2001), the City is also entitled to summary judgment in its favor on Cotton's THRA discrimination claim based on the failure to promote.

### 2. Discrimination Claim Based on Alleged Disciplinary Action in November 2007

As already set forth above, in order to survive summary judgment on a claim of discrimination using circumstantial evidence, under either Title VII or the THRA, the plaintiff must first produce evidence sufficient to meet his *prima facie* burden under the four-prong test set forth in *McDonnell Douglas Corp.*,

411 U.S. at 802 (1973). The City argues here that Cotton cannot establish that he suffered an adverse employment action and therefore cannot state a *prima facie* claim of discrimination based on the alleged discipline. The Court agrees.

The Sixth Circuit has repeatedly defined "adverse employment action" as a "materially adverse change in the terms and conditions of employment." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461 (6th Cir. 2000) (quoting *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir. 1999)). To support a discrimination charge,

> [a] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

*Hollins*, 188 F.3d at 662 (alteration in original; citation omitted). So-called "*de minimis*" employment actions are not materially adverse and therefore not actionable. *See, e.g.*, *Bowman*, 220 F.3d at 461–62 (holding that the plaintiff's loss of his position for only ten days with no loss of income did not amount to a materially adverse employment action); *Jacklyn v. Schering Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 930 (6th Cir. 1999) (holding that the employer's requiring plaintiff to work at home while she was recovering from out-patient surgery and rejecting computer expenses that previously had been approved were not "materially adverse employment actions"); *Jackson v. City of Columbus*, 194 F.3d 737, 752 (6th Cir. 1999) (holding that police chief's suspension with pay was not an adverse employment action); *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885 (6th Cir. 1996) ("[R]eassignments without salary or work changes do not ordinarily constitute adverse employment decisions in employment discrimination claims." (citation omitted)).

In the present case, Cotton claims he was wrongfully disciplined for leaving his shift before another firefighter was present to fill his position. While Cotton attempts to characterize his receipt of a written counseling letter as a reprimand, this disciplinary action was not sufficiently "adverse" to qualify as an adverse employment action for purposes of stating a *prima facie* claim of discrimination under Title VII. Cotton admits that he received no actual reprimand and was not subject to any official disciplinary action. When Chief Baltimore presented the draft counseling letter to him, Cotton was not asked to sign nor had it been signed by his supervisors, and Chief Garzarek told Chief Baltimore that Cotton was not being

disciplined. Cotton also admits that the form is not in his personnel file. Regardless, even if Cotton had actually received a formal written reprimand, he did not suffer a loss of pay, change of title or any other materially adverse change in the terms and conditions of his employment.

Because he did not suffer a materially adverse employment action, Cotton cannot state a *prima facie* case of race discrimination based on his allegedly being "disciplined" in November 2007. The City is therefore entitled to summary judgment in its favor as to both the Title VII and THRA discrimination claims based on that incident.

### C.      Retaliation Claim Related to Alleged Disciplinary Action in November 2007

Title VII prohibits retaliation against an employee who has "opposed" discrimination or has made a "charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). The Tennessee Human Rights Act provides an action for retaliation as well. *See* Tenn. Code Ann. § 4-21-301 (providing that it "is a discriminatory practice for a person . . . to (1) [r]etaliate . . . in any manner against a person because such person has . . . made a charge [or] filed a complaint . . . under this chapter). To establish a *prima facie* case of retaliation under Title VII or the THRA, a plaintiff must show that (1) he engaged in activity protected by statute; (2) his exercise of such protected activity was known by the employer defendant; (3) the employer thereafter took a materially adverse action against plaintiff or subjected plaintiff to severe and pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the materially adverse action or harassment. *Morris v. Oldham County Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006) (modifying the third element of a prima facie case to require "materially adverse" action rather than an "adverse employment action").

With regard to the third element of a *prima facie* case, the Supreme Court held that the anti-retaliation provision "protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Burlington Northern*, 548 U.S. at 67. In *Burlington Northern*, the Supreme Court held that a plaintiff's burden of establishing a materially adverse action is less onerous in the retaliation context than in the anti-discrimination context. *Id.* at 67–69. A materially adverse action in the retaliation context is any action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68 (internal citation and quotation omitted). Adverse action in the retaliation context

is not limited to harms "that are related to employment or occur at the workplace." *Id.* at 57. Under this more liberal definition, actions that are not deemed materially adverse for purposes of a discrimination claim may be considered as such in the retaliation context. *See, e.g.*, *id.* at 69 (observing hypothetically that a supervisor's failure to invite an employee to lunch could, under certain circumstances, amount to materially adverse retaliation action).

Whether an action is materially adverse depends on the circumstances surrounding the action. *Id.* at 69. The Court cautioned that "it is important to separate significant from trivial harms" and stated that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 68. After *Burlington Northern*, the Sixth Circuit has held that bad employment evaluations and the denial of a lateral transfer do not rise to the level of materially adverse actions because they did not "significantly impact [the plaintiff's] professional advancement and would not have dissuaded a reasonable person from filing a Title VII claim." *James v. Metro. Gov't of Nashville*, 243 F. App'x 74, 79 (6th Cir. 2007) (noting that the evaluations the plaintiff received after she filed EEOC charges were "not markedly worse than earlier ones and the evaluations did not affect her earnings"). By contrast, markedly worse performance evaluations, given after an employee took protected action, that significantly impacted an employee's wages or professional advancement have been considered materially adverse. *Halfacre v. Home Depot, U.S.A., Inc.*, 221 F. App'x 424, 433 (6th Cir. 2007).

The City argues that Cotton cannot state a claim for retaliation based upon the counseling letter, because he cannot show that the counseling letter constitutes a materially adverse action under *Burlington Northern*. The Court agrees that the alleged disciplinary action does not constitute a materially adverse action of the type that will sustain a claim for retaliation, because no reasonable employee would have found the aborted written reprimand to be adverse to the extent that it would deter a reasonable worker from making or supporting a charge of discrimination. In fact, it did not dissuade Cotton from filing another EEOC charge and lawsuit. The Court concludes that the kind of "discipline" at issue here can only be characterized as a mere nuisance or a minor annoyance, at worst. The City is therefore entitled to summary judgment disposing of Cotton's claim of retaliation based upon the alleged disciplinary action in November 2007.

The Court notes that, although the plaintiff very clearly stated a claim in his Complaint for retaliation based upon the failure to promote, the defendant's motion for summary judgment does not address that claim—it addresses only the claim for retaliation based upon the counseling letter Cotton received from Greg Baltimore in November or December 2007. The retaliation claim based on the failure to promote therefore remains pending.

**D.       The Plaintiff Has Not Stated a Claim under § 1981.**

Cotton alleges that the City violated the Civil Rights Act of 1991, 42. U.S.C. § 1981. In its motion, the City contends that Cotton's exclusive remedy for a violation of rights established by 42 U.S.C. § 1981 by a municipality is a suit brought pursuant to 42 U.S.C. § 1983. The Court agrees that the City is entitled to summary judgment as to any claim brought against it under § 1981.

Section 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

While § 1981 does not expressly afford a cause of action to private parties, the Supreme Court held in *Runyon v. McCrary*, 427 U.S. 160 (1976), that private defendants may be held liable under its provisions. *Id.* at 174–75. In *Jett v. Dallas Independent School District*, 491 U.S. 701 (1989), the Supreme Court specifically held that § 1981's implicit cause of action does not extend to suits brought against state actors. *Id.* at 732. Two years after *Jett*, however, Congress amended § 1981 to provide that "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and *impairment under color of State law.*" 42 U.S.C. § 1981(c) (emphasis added).

The question then arose whether that amendment was intended to overrule *Jett*. In a comprehensive analysis, the Sixth Circuit recently concluded that it did not:

The legislative history on § 1981(c) indicates that it was intended to codify *Runyon v. McCrary*, and indeed such an interpretation of subsection (c) is consistent with the judicial history of § 1981. . . . Section 1981(c) reflects Congress' determination that *stare decisis* provided an inadequate firewall against a future Supreme Court decision obviating the rights recognized by *Runyon*; nothing in § 1981(c)'s history or text indicates that Congress intended it to serve some other purpose. Accordingly, we conclude that § 1981(c) was directed at preserving the Supreme Court's decision in *Runyon*, not, as Plaintiff argues, at overruling *Jett*.

*Arendale v. City of Memphis*, 519 F.3d 587, 598 (6th Cir. 2008). Having reached the conclusion that § 1981(c) did not overrule *Jett*, the Sixth Circuit also determined that it had "no choice but to follow *Jett* as binding authority," and on that basis held that "no independent cause of action against municipalities is created by § 1981(c)." *Id.* at 599. This Court is bound by the Sixth Circuit's interpretation and application of *Jett*. Consequently, it is clear that the City is entitled to summary judgment as a matter of law on any claim brought against it by Cotton pursuant to 42 U.S.C. § 1981.

## IV. CONCLUSION

For the reasons set forth herein, the Court finds that the City is entitled to partial summary judgment in its favor. Specifically, the City's Motion for Summary Judgment will be granted as to Cotton's claims for (1) age discrimination; (2) race discrimination and retaliation based upon the alleged disciplinary action arising from his leaving his station shorthanded in November 2007; and (3) race discrimination based upon the December 2007 failure to promote; and (4) race discrimination under 42 U.S.C. § 1981. The City, however, has failed to establish that it is entitled to summary judgment on Cotton's claims for hostile work environment, or for retaliation in connection with the failure to promote. The motion for summary judgment as to those claims will be denied. An appropriate order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge